IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NANCY MARTIGNAGO, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MERRILL LYNCH & CO., INC., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, BANK OF AMERICA CORPORATION,<br><br>Defendants. | Civil Action No. _____<br><br>**COMPLAINT**<br><br>Jury Trial Demanded |

## COMPLAINT

Plaintiff Nancy Martignago ("Plaintiff" or "Martignago"), on behalf of herself and all others similarly situated, by and through her undersigned attorneys, hereby files this Complaint against Defendants Merrill Lynch & Co., Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), and Bank of America Corporation ("Bank of America") (collectively "Defendants" or "Firm"), and states as follows:

### NATURE OF THE ACTION

1. Plaintiff brings this action on behalf of herself and other similarly situated employees of Defendants who were not paid wages they earned for work performed as a result of Defendants' violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, as well as other unlawful labor practices and unlawful acts committed by Defendants.

2. Plaintiff seeks to bring this action as a collective class action under the FLSA for unpaid overtime compensation and related penalties and damages on behalf of all Client Associates ("CAs") who were or are employed by Defendants at their retail branch office

1

locations and to whom Defendants have unlawfully failed or fail to pay overtime for work performed in excess of forty hours per workweek as required by federal law.[1] In particular, Defendants require these nonexempt CAs to be present at work and perform work, including both before, during, and after their scheduled shifts, but fail to pay them overtime accordingly. Also, Defendants require these CAs to perform work tasks during unpaid break times.

3.   As a result of Defendants' unlawful actions, Plaintiff and all those similarly situated have been and are unlawfully under-compensated and suffer other harm. Through this action, Plaintiff seeks equitable and injunctive relief as well as damages, including but not limited to damages for the compensation that she and all those similarly situated have been and are currently denied.

## JURISDICTION AND VENUE

4.   Plaintiff's claims arise under The Fair Labor Standards Act, 29 U.S.C. § 201, *et seq*. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1331 and 29 U.S.C. § 216(b) which provides in relevant part that suit under the FLSA "may be maintained against any employer ... in any Federal or State Court of Competent jurisdiction." Supplemental jurisdiction exists with respect to Plaintiff's individual claims under 28 U.S.C. §1367.

5.   Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391. The corporate headquarters and principal place of business of Defendant Merrill Lynch is located in New York City. Moreover, both Defendants are licensed and do business in this District.

---

[1] Plaintiff Martignago has filed a representative Charge of Discrimination with the Equal Employment Opportunity Commission. After having exhausted her administrative remedies and upon receiving her Notice of Right to Sue, Plaintiff intends to amend her complaint to include allegations of gender discrimination and retaliation under Title VII of the Civil Rights Act, as amended, on an individual and class-wide basis.

## PARTIES

6. Plaintiff Nancy Martignago is a female CA who began her employment with Merrill Lynch in approximately 1985. Plaintiff currently works as a Senior Registered CA for Merrill Lynch, and has spent much of her career as a CA in Merrill Lynch's Fort Worth, Texas branch office, where she is currently employed.

7. Defendant Merrill Lynch is a registered broker dealer and investment advisor that provides brokerage and investment banking services, among others. Prior to January 1, 2009, Merrill Lynch was a wholly owned subsidiary of Merrill Lynch & Co., Inc., a financial services holding company.

8. Defendant Bank of America is one of the largest financial services companies in the world, serving clients in over 150 countries, and having relationships with over 99% of the United States' Fortune 500 companies. Incorporated in Delaware and headquartered in North Carolina, Bank of America provides a wide variety of banking and investment services to individual, corporate, and institutional clients worldwide. Through the merger with Merrill Lynch, explained in further detail below, Bank of America became the largest brokerage in the world, with over 15,000 financial advisors, and approximately $2.2 trillion in client assets.

9. On September 15, 2008, Bank of America and Merrill Lynch announced that Bank of America would acquire Merrill Lynch for approximately $50 billion in an all-stock transaction. The acquisition closed on January 1, 2009. As a result of the acquisition, Merrill Lynch & Co., Inc. and all of its subsidiaries (including Merrill Lynch, Pierce, Fenner & Smith Incorporated) are now wholly owned subsidiaries of Bank of America.

## SUMMARY OF CLAIMS

10. Plaintiff, who is employed as a CA for Defendants, seeks to bring this action on behalf of herself and all those similarly situated for unpaid wages and overtime compensation owed, and any other relief owed, pursuant to the FLSA ("The FLSA Class"). The FLSA class includes all current and former Merrill Lynch CAs, who are collectively employed by Defendants, and who were or are unlawfully denied overtime compensation, among other violations of the FLSA, by Defendants.

11. At all times relevant, Plaintiff, and all those similarly situated, were or are employees of Defendants as defined by the FLSA.

12. At all times relevant, Defendants were or are the collective employers of Plaintiff, and all those similarly situated, as defined by the FLSA.

13. Plaintiff's primary job duties, as well those of the putative FLSA class members, and as described more fully below, are to provide service and assistance to Defendants' Financial Advisor ("FA") workforce. Defendants' CAs are all subject to the same rules, regulations, operating policies and procedures, and human resources policies and practices, and generally share the same job descriptions, throughout all of Defendants' branches and offices in the United States.[2]

14. Defendants have willfully refused to pay Plaintiff, and the FLSA class, overtime wages owed to them for working hours in excess of a forty-hour work week, at a rate of one and one half times their normal rates of pay, and in some cases, double their normal rates of pay, in violation of the FLSA.

---

[2] CAs who have obtained certain securities licenses are able to perform select, additional functions for their FAs, however these few additional responsibilities do not render their job assignments wholly or operationally different from unlicensed CAs. Indeed, many times CAs who obtain securities licenses find that they are required to perform additional work for which they are not compensated.

4

15. Defendants also willfully fail and have failed to maintain records of overtime worked by Plaintiff and the FLSA class. In so doing, Defendants have violated the record keeping requirements of the FLSA.

16. Defendants practices violate the FLSA. Plaintiff, and all those similarly situated, seek injunctive and declaratory relief, overtime compensation for all unpaid overtime wages, liquidated and/or other damages and penalties as permitted under the law, interest, and attorneys' fees and costs.

## FACTUAL ALLEGATIONS

### Allegations Common To All Claims

17. Defendants provide retail brokerage services to their clients through their FA workforce. CAs are assigned to work for FAs and play an essential role in supporting FAs and servicing Defendants' clients, including Merrill Lynch clients. CAs provide necessary administrative and sales assistance to FAs, which help FAs meet compliance requirements, operate efficient businesses, and properly service and grow their client bases. Many of the duties of a CA are those that are stereotypically assigned to women. CAs routinely transmit facsimiles, cover the switchboard, photocopy, collate documents, run personal errands for an FA and other clerical work.

18. Some CAs are "registered," which means that they have passed examinations and met other regulatory and Financial Industry Regulatory Authority ("FINRA") requirements to earn certain regulatory licenses. Registered CAs can have even greater value to FAs, as registered CAs may have closer dealings with clients, execute trades, and perform other functions that only registered persons can perform, allowing FAs more time to prospect and

grow their businesses. Despite the critically important functions that CAs perform, they are subject to unlawful pay practices in violation of federal and state wage laws by Defendants.[3]

19. All CAs working for Defendants are similarly situated in that they all perform essentially the same respective job functions.

20. All CAs are similarly situated in that they are all subject to the same compensation policy, plan, or procedure that requires them to perform work and/or requires them to be present at work while not compensating them for their services. In turn, this denies the putative plaintiffs compensation for services performed, and denies them their overtime compensation.

21. The Defendants implement this compensation policy, plan, or procedure under the following methods: (a) Defendants do not allow CAs to record all time worked in excess of forty hours per work week; (b) Defendants erase or modify the CAs' recorded time in order to eliminate or reduce overtime hours; (c) Defendants offer "comp time" to CAs in lieu of paying overtime for hours worked in excess of forty hours per work week; and/or (d) Defendants require CAs to perform work during unpaid breaks.

22. As employees of Merrill Lynch, CAs receive a base salary from Merrill Lynch, but their salaries are generally low, and are often not commensurate with the market, or with the CA's skills and duties. Although CAs may receive small raises and/or bonuses, including cost of living and merit increases, these increases are based on the low base salary that Merrill Lynch pays, and not the CA's total compensation.

23. The majority of CAs' earnings come from what is generally called "supplemental compensation," which is paid by the FAs with whom the CAs work. Merrill Lynch FAs pay

---

[3] As previously stated, Plaintiff will also allege that CAs were and are subject to unlawful gender discrimination, job segregation, and retaliation.

their CAs from their (the FAs') commissions. On information and belief, the FA and CA agree upon an amount, report their agreement to Merrill Lynch management, and, upon management approval, the amount is deducted from the FA's commissions and paid out monthly by Merrill Lynch, with the CA's regular check from Merrill Lynch. Thus, most CAs strive to work for the highest producers, or earners, who can pay them the most supplemental compensation.[4]

24. The supplemental compensation that CAs receive is not a bonus, gift, or incentive payment. This supplemental compensation constitutes part of a CA's regular pay, upon which CAs depend and expect once an agreement has been met between the CA, the FA and Merrill Lynch management. Indeed, on information and belief, in addition to the supplemental compensation, Merrill Lynch even permits the FA to control payment of portions of the CA's base salary from the FA's commissions, if the FA and CA agree, and management grants approval to the arrangement. Thus, FAs have a substantial amount of control over CAs' compensation.

25. With respect to overtime, CAs earn overtime based on their low base Merrill Lynch salaries, and not their total compensation, so their overtime is compensated at an unlawfully and artificially low rate. Moreover, many CAs are not paid the proper amount of overtime that they earn, if they are paid overtime at all. Both of these actions are unlawful under the FLSA.

26. Merrill Lynch also requires that management approve overtime before it is paid. However, Merrill Lynch management frequently refuses to authorize overtime, even in situations where the CA is compelled to work overtime by her supervising FA. This denial of overtime pay

---

[4] The FAs for whom the CAs work are not required to give bonuses. Thus, bonuses paid by FAs are irregularly paid, at nonstandard, discretionary amounts, and can be withheld, despite prior promise or agreement, given the discretionary nature of the pay structure.

is unlawful under the FLSA, regardless of whether Merrill Lynch pre-approved the overtime hours worked.

27. Many FAs require their CAs to work overtime, even without management authorization. As Merrill Lynch is well aware, many CAs, out of fear of angering their FAs or for fear of disturbing their compensation arrangements with the FAs, do not refuse to work the overtime hours requested or required by their FAs, nor do they raise overtime issues with or ask to be paid overtime by their FAs. In any event, Merrill Lynch (and not the FA) is required to compensate CAs for their overtime. Thus, many CAs are denied payment for the overtime hours owed to them because they worked the hours without prior management authorization, or are denied authorization after the fact, when Merrill Lynch management is well aware that the CAs have worked the overtime. This denial of overtime pay is also unlawful under the FLSA.

28. Defendants thus knowingly and willfully violate the FLSA by failing to properly compensate its CAs, including for overtime worked, and by failing to properly record and account for the full time that CAs work, thereby creating incomplete and inaccurate work and payroll records. Failure to maintain accurate record of overtime worked is also a violation of the FLSA.

29. In addition to the above, Merrill Lynch's policies, practices and conduct, in particular the CA compensation structure, leads to other violations of federal laws, including discrimination and retaliation on the basis of gender. Female CAs suffer discrimination not only through disparate and unfair treatment, but also as a result of the discriminatory impact of Merrill Lynch's firm-wide policies and practices.

30. As an example of such discrimination, females are often steered away from the FA role, which has a much greater earning potential, to the less prestigious CA role. Conversely,

the few males who work as CAs are often developed out of the CA role, into the more prestigious Investment Associate ("IA") or even FA or other high producing roles, such as management positions. Male CAs are also often placed on high producing teams that allow not only for their greater exposure and career development, but also for higher earnings. Therefore, due to discriminatory job selection and steering practices, the majority of the Merrill Lynch CA workforce is and has been female. Conversely, the great majority of the FA population at Merrill Lynch is male.

31. Although high producing FAs have some role in selecting their CAs, Merrill Lynch management has the authority to assign CAs to certain FAs.[5] Moreover, in deciding to shift the CAs' compensation and earning ability to the FA workforce, Merrill Lynch creates an unfair imbalance of power, a culture ripe for hostility and gender bias, and a breeding ground for discrimination and retaliation. As a result, CAs assume many administrative, menial, traditionally "female," and personal, rather than professional, tasks, which are often denigrating, demeaning, and based on harmful gender stereotypes. For example, a skilled, registered CA, such as Plaintiff, is often directed to perform tasks ranging from answering phones, executing trades, and preparing and scheduling client meetings, to serving food and beverages at client meetings, and cleaning up after office meetings and events.

32. Notably, although Merrill Lynch permits FAs to pay CAs, it sets no mandate, scale, or even advisory guidelines on how much the supplemental compensation should be, except that if the FA does engage in the supplemental compensation, it must pay the CA at least $100 annually if the FA decides to base the supplemental compensation on production hurdles,

---

[5] In fact, it is generally only the high producing male FAs and teams that are assigned the "best" CAs and sales assistance, as Merrill Lynch strives to keep its top male producers appeased and place them in the best position for success and income generation, consistent with the pattern and practice of discrimination at Merrill Lynch as proven in *Cremin v. Merrill Lynch*, Case No. 96-C-3773 (N.D. Ill.). The *Cremin* plaintiffs, who were female Merrill Lynch FAs, proved a pattern and practice of systemic discrimination against female FAs at the Firm.

or percentages of the FAs production at various levels. Otherwise, the amount of supplemental compensation is completely at the FA's discretion. Importantly, FAs also have the discretion to change the amount of supplemental compensation, without explanation to the CAs or to Merrill Lynch management. On information and belief, although Merrill Lynch requires that the supplemental compensation remain constant for a six-month period (*i.e.*, between January and June, and again between July and December), the FA has discretion to raise, lower, or completely eliminate the amount of the CA's supplemental compensation at will.

33. FAs control a major portion of CAs' earnings, and thus, CAs "fortunate" enough to work for large producers or high producing teams endeavor to please their FAs, in part because CAs have no real job security. When CAs, and particularly female CAs, complain, or the relationship otherwise fails, Merrill Lynch protects the primarily male FAs, and often removes the CAs from the FA or the team. This removal often happens without discussion with the CAs, and without regard for their track records, performance, or tenure. The CAs essentially become free agents, or are placed on the next team or with the next FA, and must begin anew in their assignments. Thus, a CA who has been with Merrill Lynch for 25 years is treated the same as a CA who has been with Merrill Lynch for 25 days.

34. Merrill Lynch policies and practices with respect to CAs often harm the reputations and earning potential of CAs removed from FAs or teams, as Merrill Lynch management rarely gives any explanation or other indication to the branch that the separation is not the CA's fault or choosing. Merrill Lynch often further retaliates against CAs, and specifically female CAs, who complain by removing them from their assignments and/or by failing or refusing to place them in situations where they can expect to make the same level of supplemental income.

**Individual Allegations**

35.     Plaintiff has been employed as a CA for Merrill Lynch since approximately 1985. Plaintiff has been a Registered CA throughout her tenure, as she has held securities licenses that remained active from her short tenure as an FA. During her over 25 years of employment with Merrill Lynch, Plaintiff has competently discharged all duties assigned to her and enjoyed an excellent reputation with regard to the high quality of her work and her conscientious devotion to her job.

36.     In May 2007, Merrill Lynch assigned Plaintiff to work with the Holley/Schultz FA team in the Fort Worth, Texas branch office. Plaintiff understands that the Holley/Schultz team was and is one of the highest producing teams in the branch, and in the State of Texas.

37.     Throughout Plaintiff's tenure at Merrill Lynch, Plaintiff has regularly worked in excess of forty hours per workweek. Plaintiff was regularly required to work through her lunch hour and after her normally scheduled work hours. Indeed, Russell Holley ("Holley"), one of the FA partners of the Holley/Schultz team, frequently required Plaintiff to work overtime, including through her lunch hour, and at client events that would last many hours into the evening. Merrill Lynch management was well aware that Plaintiff worked more than forty hours per workweek for Holley.

38.     Although Plaintiff frequently worked in excess of forty hours per workweek, Merrill Lynch refused to approve Plaintiff's overtime requests. Indeed, Plaintiff's direct supervisor, Diane Giza ("Giza"), Client Relationship Manager, often instructed Plaintiff and other CAs not to work overtime and refused to approve their overtime requests or authorize payment for their overtime worked, despite Giza's knowledge that the CAs were working more than forty hours. On one occasion, Giza said "Well, don't tell me that," or words to that effect,

11

when she learned that Plaintiff and other CAs had worked overtime.[6] Neither Giza nor any other member of Merrill Lynch management would authorize the overtime they knew the CAs worked, or approve overtime payments, nor did they instruct the FAs that CAs were not to work overtime or take any other appropriate action to ensure compliance with governing wage laws.

39. Despite Plaintiff's excessive hours on the job, Defendants did not pay her the overtime wages for the overtime she worked. In denying Plaintiff's overtime requests, Defendants also failed to keep accurate payroll records or other records of Plaintiff's working hours.

40. Additionally, despite Plaintiff's performance and dedication to the team, Holley frequently marginalized, belittled and berated Plaintiff, often utilizing gender stereotypes. In addition to requiring Plaintiff to perform his personal errands, Holley openly criticized and embarrassed Plaintiff, verbally attacking her both personally and professionally, where similarly situated males were not subjected to such harsh treatment.

41. Holley criticized and punished Plaintiff when she sought to help a female FA who joined the Holley/Schultz team in or around January 2009. After the FA's health required her to take a medical leave, Plaintiff stepped in to help manage the female FA's accounts in her absence. As a result, Holley decreased Plaintiff's supplemental compensation, stating that she needed to focus "on the team" which Plaintiff could only interpret as to mean Holley.

42. In or around May 2008, Holley hired a new female CA onto the team when another CA retired. The new female CA was young and attractive, and Holley treated her differently, consistent with the pattern of male FAs viewing their female staff as sex objects. For

---

[6] Plaintiff has also been improperly denied raises on account of her gender. Merrill Lynch denied Plaintiff a cost of living increase in a recent salary review, claiming that she could not have any more raises because she was at the "top of her pay scale." Plaintiff understands that male employees regularly receive cost of living raises, even when they have reached the top of their pay scale, and this is especially inappropriate because such raises are not merit based, but instead are based on the cost of living in a given market.

example, when Holley decided to move the team to the Southlake, Texas branch in January 2009, he informed the team that he could initially take only one CA with him. Although Plaintiff was senior to and had longer tenure than the new female CA, and even though Holley was aware that the move to Southlake would assist Plaintiff personally because Southlake was closer to her ailing mother, who was suffering from advanced Alzheimer's disease, Holley took the less experienced and tenured but younger and more attractive female CA with him to Southlake. Plaintiff was left behind in Fort Worth until Holley transferred the rest of the team to Southlake.

43. When Plaintiff arrived at Southlake, Holley's differential treatment of the new female CA continued. Holley refused to give Plaintiff a suitable workspace for a CA of her experience and tenure. Indeed, Plaintiff was forced to share a small, unused conference room with the branch's interns, with only a partition between them to divide her workspace from theirs. Conversely, Holley gave the new female CA a large cubicle near his own office, allowing her to be the first point of contact with all of his clients.

44. Holley also regularly engaged in open and inappropriate behavior of a flirtatious and sexual nature toward the new female CA, which created an intolerable and hostile work environment for Plaintiff.

45. After months of enduring Holley's differential treatment and having to personally witness the inappropriate interactions between Holley and the new female CA, Plaintiff complained and expressed frustration via email to a friend and fellow CA.

46. Merrill Lynch management seized possession of the email, and was therefore on notice of Plaintiff's complaints and hostile working environment. Merrill Lynch did not properly investigate Plaintiff's complaints, including failing to interview Plaintiff regarding her complaints, experiences or work environment. Instead, Merrill Lynch retaliated against Plaintiff

by removing her from the Holley/Schulz team and from the Southlake branch, without explanation or discussion.

47. Plaintiff was then demoted and transferred back to the Fort Worth branch to assist a lower producing team than the Holley/Schultz team, which adversely impacted Plaintiff's compensation and earning power. Plaintiff's retaliatory demotion and transfer back to Fort Worth has resulted in both career damage and financial harm, as Plaintiff's reputation has been sullied by both her removal and demotion from the Holley/Schultz team, and her public and humiliating demotion and transfer from Southlake back into Fort Worth.

## COUNT I

### VIOLATION OF THE FAIR LABOR STANDARDS ACT
(Collective Action and Individual Claim)

48. Plaintiff incorporates each and every allegation set forth in this Complaint.

49. Plaintiff brings FLSA claims on behalf of herself and all those similarly situated who are or were employed by Defendants as CAs within three years from the commencement of this action, and who have been or are being denied compensation, or who are not or have not been compensated for hours worked in excess of forty hours per workweek.

50. Plaintiff seeks to proceed against Defendants for their FLSA violations as a collective action, as alleged in this complaint, and pursuant to the collective action provisions of the FLSA.

51. Upon information and belief, there are thousands of similarly situated current and former CAs who are or were employees of Defendants, and who are or have been underpaid in violation of the FLSA, and who should be notified of and allowed to opt-in to this action, pursuant to 29 U.S.C. § 216(b).

52. Many of these similarly situated CAs would not otherwise be able to pursue their federal wage claims without the assistance of this collective action, because they lack the financial resources to prosecute the action on an individual basis, and/or because they fear retaliation, among other reasons.

53. The names and addresses of these similarly situated employees are available from Defendants. Defendants can readily locate them so that notice of this action can be issued.

54. Throughout the relevant time period, Plaintiff was and is an employee of Defendants as defined by the FLSA.

55. Throughout the relevant time period, Defendants were and are employers of Plaintiff and the FLSA class, as defined by the FLSA, and are engaged in commerce and/or the production of goods for commerce as defined by the FLSA.

56. On information and belief, Merrill Lynch CAs, including Plaintiff, are nonexempt employees as defined by the FLSA.

57. On information and belief, Merrill Lynch CAs, including Plaintiff, are not subject to any of the exemptions as defined by the FLSA.

58. At all times relevant, Defendants have willfully failed to pay Plaintiff and the FLSA class overtime compensation, at rates less than one and one-half times their regular rate of pay, for hours worked in excess of forty hours per workweek. By failing to do so, Defendants have violated the overtime wage provisions of the FLSA.

59. Moreover, Defendants have willfully and intentionally engaged in a persistent pattern and practice of violating provisions of the FLSA by failing to properly pay Plaintiff and the FLSA Class overtime wages as defined by the FLSA and by paying CAs overtime rates

based upon their base salaries only, and not their total compensation, including their company-sanctioned supplemental compensation.

60. As described above, by refusing to pay Plaintiff and the FLSA Class, or credit them for overtime hours worked in excess of forty hours per workweek, Defendants willfully fail and have failed to record, report, and maintain accurate work records for hours worked and wages earned for Plaintiff and the FLSA Class as required by the FLSA, 29 U.S.C.A. § 211. Additionally, any records that Defendants did in fact keep concerning the number of hours Plaintiff and the FLSA Class worked in excess of forty hours in any workweek are in the exclusive possession and control of Defendants and, as such, Plaintiff is unable to state the exact amount due and owing to her at this time.

61. Plaintiff expressed her consent to make these claims under the FLSA against Defendants pursuant to 29 U.S.C.A. § 216(b), as is demonstrated by her written consent attached hereto as Exhibit A. Plaintiff expects that other individuals will sign consent forms and join as plaintiffs on this claim in the future.

62. The foregoing conduct, as alleged, constitutes a willful violation of the FLSA within the meaning of 29 U.S.C.A. § 255(a). Thus, Plaintiff and the FLSA class are entitled to the longer, 3-year limitations period in this action.

63. As a result of Defendants' unlawful actions, Plaintiff and the FLSA class have suffered harm and are entitled to damages. Plaintiff, on behalf of herself and the nationwide FLSA class, seeks damages including unpaid overtime compensation, liquidated damages, attorneys' fees and costs, interest, and any and all such other equitable and legal relief permitted by the FLSA, and which this Court finds just and proper.

## COUNT II

## BREACH OF CONTRACT AND UNJUST ENRICHMENT
### (Claim of Plaintiff Martignago Only)

64. Plaintiff incorporates each and every allegation set forth in this Complaint.

65. Defendants entered into certain oral and written contracts with Plaintiff, whose terms are set forth in written instruments, oral promises, practices of customary conduct, employee handbooks, and Firm policies, among other things. These contracts governed and created obligations to Plaintiff with respect to her terms of employment, including that Defendants would act in compliance with federal law.

66. These contracts required Defendants' compliance with their terms and with federal laws, including but not limited to the FLSA.

67. Defendants breached these contracts by engaging in the conduct described herein and by otherwise failing to perform its obligations under these agreements and the laws set forth in this Complaint.

68. Moreover, by breaching these contracts, Defendants have been unjustly enriched by the work that Plaintiff performed for the Defendants' benefit, but for which she was not compensated.

69. Defendants' breaches of these agreements caused Plaintiff substantial harm, for which she is owed, and seeks damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court find in favor of her and the FLSA and ERISA Classes and against Defendants as follows:

    a. Designation of this action as a collective action on behalf of the proposed members under the FLSA, and that the Court issue prompt notice to all

similarly situated putative collective action plaintiffs to provide them notice of this action, the nature of the claims, and of their right to file consents and join this lawsuit pursuant to 29 U.S.C. § 216(b);

  b. Designate Plaintiff as a Class Representative for the putative collective action plaintiffs;

  c. Designate Plaintiff's counsel of record as counsel to represent the putative collective action plaintiffs;

  d. A declaratory judgment that Defendants' acts, conduct, policies and practices complained of herein are unlawful and violate the FLSA;

  e. Order appropriate equitable and injunctive relief to remedy the violations of the FLSA;

  f. Award Plaintiff and all others similarly situated the value of all compensation and benefits lost as a result of Defendants' unlawful conduct, including, but not limited to unpaid overtime wages and liquidated damages;

  g. Award Plaintiffs and all others similarly situated prejudgment and post-judgment interest and attorneys fees, costs and disbursements, as provided by law;

  h. Award Plaintiff the value of all compensation and benefits lost as a result of Defendants' breach of contract, including but not limited to restitution of any funds that Defendants have unjustly received from Plaintiff; and

  i. Award Plaintiff and all others similarly situated such other relief as this Court deems just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a jury trial as provided the Federal Rules of Civil Procedure with respect to any and all claims to which she and all those similarly situated have a right to a jury trial.

Dated: 6/8/2011

Respectfully submitted on behalf of Plaintiff Nancy Martignago and all those similarly situated,

By: _____
Jennifer Schoen Gilbert
(Admitted in Illinois and Indiana)
Application for Admission on Motion to Practice as an Attorney and Counselor-at-Law in the State of New York has been initiated.

Linda D. Friedman
Jennifer S. Gilbert
**STOWELL & FRIEDMAN, LTD.**
321 S. Plymouth Court, Suite 1400
Chicago, IL 60604
312-431-0888 (phone)
312-431-0228 (fax)
Jgilbert@sfltd.com

By: _____
Shona B. Glink (Local Counsel)

Shona B. Glink
**MEITES, MULDER & GLINK**
321 South Plymouth Court, Suite 1250
Chicago, Illinois 60604
312-263-0272 (phone)
312-263-2942 (fax)
SBGlink@mmmglaw.com
**(Local Counsel)**