## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| NANCY MARTIGNAGO, RHONDA DEENEY, AMY FERGUSON, CINDY SELLERS on behalf of themselves and all others similarly situated, | ) ) ) ) ) | Case No. 11-cv-03923-PGG |
| Plaintiffs, | ) ) | **Judge Paul G. Gardephe** |
| v. | ) ) | Jury Trial Demanded |
| MERRILL LYNCH & CO., INC., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, BANK OF AMERICA CORPORATION, | ) ) ) ) ) ) | |
| Defendants. | | |

## AMENDED COMPLAINT

Plaintiffs Nancy Martignago, Rhonda Deeney, Amy Ferguson, and Cindy Sellers, on behalf of themselves and all others similarly situated, by and through their attorneys, hereby file this Complaint against Defendants Merrill Lynch & Co., Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch" or "the Firm"), and Bank of America Corporation ("Bank of America") (collectively "Defendants"), and state as follows:

## NATURE OF THE ACTION

1.      Plaintiffs work or worked as Client Associates for Merrill Lynch at twelve branch offices in six different states; all were subjected to the same unlawful pay practices. Plaintiffs bring this action on behalf of themselves and other similarly situated Client Associates ("CA") employed by Defendants who, pursuant to Merrill Lynch corporate policies and practices, were not paid the lawful overtime wages and benefits they earned for work performed as a result of Defendants' violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*

2.      Plaintiffs challenge Defendants' employment policies and practices that divert certain supervisory and pay decisions regarding their CA employees to other employees, Financial Advisors, but require Merrill Lynch management approval before paying CAs for overtime work. These policies and practices result in a pattern where CAs are required to work overtime hours but Merrill Lynch does not properly record such hours and does not properly calculate or compensate its CA workforce based on the overtime they are required to work.

3.      Plaintiffs challenge Defendants' corporate policy of underpaying even authorized overtime by excluding a substantial portion of CAs' regular earnings, called supplemental pay, in the calculation of overtime pay. This corporate policy and practice applies to and harms all Merrill Lynch CAs.

4.      Whether the above corporate policies and practices result in the unlawful underpayment of overtime pay under the FLSA are common questions best resolved in a classwide proceeding, which will generate common answers apt to drive the resolution of the litigation.

5.      As a result of Defendants' unlawful actions, Plaintiffs and all those similarly situated have been and are unlawfully under-compensated and suffer other harm. Plaintiffs seek to bring this action as a collective action under the FLSA to pursue equitable and injunctive relief to end Defendants' unlawful pay practices and to recover the unpaid overtime compensation earned by but not paid to CAs for work they performed.[1]

---

[1] Plaintiffs Martignago and Ferguson have filed representative Charges of Discrimination with the Equal Employment Opportunity Commission. Plaintiff Sellers intends to do so in connection with the filing of this Amended Complaint. After having exhausted their administrative remedies and upon receiving their Notices of Right to Sue, Plaintiffs intend to amend their complaint to include allegations of gender discrimination and retaliation under Title VII of the Civil Rights Act, as amended, on an individual and class-wide basis.

## JURISDICTION AND VENUE

6.      Plaintiffs' claims arise under The Fair Labor Standards Act, 29 U.S.C. § 201, *et seq*. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1331 and 29 U.S.C. § 216(b), which provide in relevant part that suit under the FLSA "may be maintained against any employer … in any Federal or State Court of Competent jurisdiction."  Supplemental jurisdiction exists with respect to Plaintiffs' individual claims under 28 U.S.C. §1367.

7.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391.  The corporate headquarters and principal place of business of Defendant Merrill Lynch is located in this District in New York City, where Merrill Lynch employs thousands of employees and where many of its corporate policies and decisions are made.  All Defendants are licensed and do business in this District.

8.      If this collective action is certified, it will include class members and party plaintiffs who work for Merrill Lynch across the country, the greatest concentration of whom worked and/or resided in New York, where all Defendants also reside.  Because Plaintiffs' individual and collective action claims challenge Merrill Lynch's corporate policies and systemic conduct, the majority of witnesses and records upon which Plaintiffs seek to rely are located in its New York headquarters and New Jersey corporate offices, both within the subpoena power of this Court. *See Chambers, et al. v. Merrill Lynch & Co., Inc*., Case No. 09-cv-2236-UNAS-JEO (Jan. 11, 2010, D.C. Al.) (granting Merrill Lynch's §1404(a) motion to transfer to Southern District of New York where the policies and plans at issue were derived and monitored).

## PARTIES

9.      Plaintiff Nancy Martignago ("Martignago") is a female CA who began her employment with Merrill Lynch in approximately 1985.  Martignago currently works as a Senior

Registered CA for Merrill Lynch, and has spent much of her career as a CA in Merrill Lynch's Fort Worth, Texas branch office, where she is currently employed.

10.     Plaintiff Rhonda Deeney ("Deeney") was employed by Merrill Lynch for over 28 years, and served Merrill Lynch as a Registered CA from 1981 until October, 2008.  Deeney worked in the Chesterfield, Ladue, Clayton, and St. Peters, Missouri Merrill Lynch branch offices.

11.     Plaintiff Amy Ferguson ("Ferguson") worked as a CA for Merrill Lynch in the Naples, Florida branch offices from December 1999 until April 2011.

12.     Plaintiff Cindy Sellers ("Sellers") is a CA in the Seattle, Washington branch office of Merrill Lynch, where she has been employed since December, 2010.  Sellers also worked as a CA for Merrill Lynch in the Naples, Florida branch offices from 2004 to 2010, and in the Bridgewater, New Jersey branch office from 2002 until 2004.

13.     Defendant Merrill Lynch is a registered broker dealer and investment advisor that provides brokerage and investment banking services, among others.  Prior to January 1, 2009, Merrill Lynch was a wholly owned subsidiary of Merrill Lynch & Co., Inc., a financial services holding company.

14.     Defendant Bank of America is one of the largest financial services companies in the world, serving clients in over 150 countries, and having relationships with over 99% of the United States' Fortune 500 companies.  Incorporated in Delaware and headquartered in North Carolina, Bank of America provides a wide variety of banking and investment services to individual, corporate, and institutional clients worldwide.  Through the merger with Merrill Lynch, explained in further detail below, Bank of America became the largest brokerage in the world, with over 15,000 financial advisors, and approximately $2.2 trillion in client assets.

15.    On September 15, 2008, Bank of America and Merrill Lynch announced that Bank of America would acquire Merrill Lynch for approximately $50 billion in an all-stock transaction.  The acquisition closed on January 1, 2009.  As a result of the acquisition, Merrill Lynch & Co., Inc. and all of its subsidiaries (including Merrill Lynch, Pierce, Fenner & Smith Incorporated) are now wholly owned subsidiaries of Bank of America.

## SUMMARY OF COLLECTIVE ACTION CLAIMS

16.    Plaintiffs, who are or were employed as Merrill Lynch CAs, seek to bring this action on behalf of themselves and all those similarly situated for unpaid wages and overtime compensation and other relief owed under the FLSA ("the FLSA Class"). The FLSA Class includes all current and former Merrill Lynch CAs, who are collectively employed by Defendants, and who were or are unlawfully denied overtime compensation, among other violations of the FLSA, pursuant to Defendants' unlawful pay practices.

17.    At all times relevant, Plaintiffs, and all those similarly situated, were or are employees of Defendants as defined by the FLSA.

18.    At all times relevant, Defendants were or are the collective employers of Plaintiffs, and all those similarly situated, as defined by the FLSA.

19.    Plaintiffs' primary job duties, as well those of the putative FLSA class members, and as described more fully below, are to provide service and sales assistance to Defendants' clients and its Financial Advisor ("FA") workforce.  Defendants' CAs are all subject to the same rules, compensation and personnel policies, operating policies and procedures, and human resources policies and practices, and generally share the same job description, throughout all of Defendants' branches and offices in the United States.[2]

_____

[2] CAs who have obtained certain securities licenses are able to perform select, additional functions for their FAs; however, these few additional responsibilities do not render their job assignments wholly or

20.     Defendants have willfully refused to pay Plaintiffs, and the FLSA Class, overtime wages owed to them for working hours in excess of a forty-hour work week, at a rate of one and one half times their normal rates of pay, and in some cases, double their normal rates of pay, in violation of the FLSA.

21.     Defendants also willfully fail and have failed to maintain records of overtime worked by Plaintiffs and the FLSA class.  In so doing, Defendants have violated the record keeping requirements of the FLSA.

22.     Defendants' policies and practices violate the FLSA.  Plaintiffs, and all those similarly situated, seek injunctive and declaratory relief, overtime compensation for all unpaid overtime wages, liquidated and/or other damages and penalties as permitted under the law, interest, and attorneys' fees and costs.

## FACTUAL ALLEGATIONS

23.     Defendants provide retail brokerage services to their clients through their FA workforce.  CAs are assigned to work for FAs and play an essential role in supporting FAs and servicing Defendants' clients.  CAs provide necessary administrative and sales assistance to FAs, which help FAs meet compliance requirements, operate efficient businesses, and properly service clients and grow their business and client bases.  In addition to providing valuable sales assistance, many of the duties of a CA are those that are stereotypically assigned to women.

24.     Some CAs are "registered," which means that they have passed examinations and met other regulatory and Financial Industry Regulatory Authority ("FINRA") requirements to earn certain regulatory licenses.  Registered CAs may also execute trades and perform other

---

operationally different from unlicensed CAs.  Indeed, many times CAs who obtain securities licenses find that they are required to perform additional work for which they are not compensated.

functions that only registered persons can perform, allowing FAs more time to prospect and grow their businesses.

25.     Despite the critically important functions that CAs perform, they are subject to unlawful pay practices in violation of federal and state wage laws by Defendants.[3]

26.     All CAs working for Defendants are similarly situated in that they all perform essentially the same job functions.

27.     All CAs are similarly situated in that they are all subject to the same compensation policies, plans, and practices that require them to perform work and/or require them to be present at work while not properly compensating them for their services at the correct overtime rate of pay.  In turn, this denies the putative plaintiffs compensation for services performed, and denies them their overtime compensation.

28.     Through firm-wide corporate policies, Merrill Lynch established and maintains a compensation system whereby CA regular pay is comprised of two main components: (1) a salary paid by the Firm, and (2) "supplemental compensation" paid from the commissions of the FAs to whom the CAs are assigned by Merrill Lynch.

29.     Merrill Lynch sets salaries for their CA employees.  These salaries are generally low, and are often not commensurate with the market or their skills and duties. Although CAs may receive small raises and/or bonuses, including cost of living and merit increases, these increases are based on the low base salary that Merrill Lynch pays, and not the CA's total compensation or regular pay.  As a result, a substantial portion of CAs' regular compensation is from "supplemental compensation."

---

[3] As previously stated, Plaintiffs Martignago, Ferguson and Sellers will also allege that CAs were and are subject to unlawful gender discrimination, job segregation, and retaliation.

30.     A substantial portion of CAs' earnings come from what is generally called "supplemental compensation," which is paid by the FAs with whom the CAs work.  Thus, most CAs strive to work for the highest producers, or earners, who can pay them the most supplemental compensation.[4]

31.     Under Merrill Lynch policies and practices, supplemental compensation is set by the FAs for whom Merrill Lynch assigns CAs to work.  Supplemental compensation is set forth in written agreements and until very recently was fixed for a six-month period, either in terms of a fixed amount or percentage of commissions.  While Merrill Lynch requires its FA workforce to pay for this supplemental compensation from the FAs' commissions from Firm and FA clients, Merrill Lynch controls the supplemental compensation.  Merrill Lynch management must review and approve CA supplemental compensation.  In addition, Merrill Lynch actually makes the fund transfer, withholds all taxes, and administers the payment.  Supplemental compensation is deducted from the FA's commissions and paid out monthly by Merrill Lynch, with the CA's regular check from Merrill Lynch. Thus, CAs receive checks for supplemental compensation and salary from Merrill Lynch, not from the FAs to whom they are assigned.

32.     The supplemental compensation that CAs receive is not a bonus, gift, or incentive payment.  This supplemental compensation constitutes part of a CA's regular pay, upon which CAs depend and expect once an agreement has been met between the CA, the FA and Merrill Lynch management.[5]  Indeed, on information and belief, in addition to the supplemental

---

[4] The FAs for whom the CAs work are not required to give bonuses.  Thus, bonuses paid by FAs are irregularly paid, at nonstandard, discretionary amounts, and can be withheld, despite prior promise or agreement, given the discretionary nature of the pay structure.

[5] It is Plaintiffs understanding that, although their overtime was not paid on their supplemental compensation, their medical benefits costs were calculated based on their salary and supplemental compensation.  This meant that if a CA was assigned to a higher producing FA or team of FAs earning more, they would be charged more for benefits subsequently even if the CA was subsequently transferred or her supplemental compensation decreased at the discretion of the FA.

compensation, Merrill Lynch even permits the FA to control payment of portions of the CA's base salary from the FA's commissions, if the FA and CA agree, and management grants approval to the arrangement.  Thus, Merrill Lynch has created a compensation scheme that grants FAs a substantial amount of control over CAs' compensation.

33.     With respect to overtime, CAs earn overtime based on their low base Merrill Lynch salaries, and not their total compensation.  As a result, CAs' overtime is calculated and compensated at an unlawful and artificially low rate.  When CAs work overtime, their overtime pay is calculated and paid at a rate based only on their salary, and not the supplemental compensation that forms a substantial part of their regular base pay, in violation of the FLSA.

34.     Through its corporate policies and practices that divert certain supervisory and compensation decisions regarding CAs to its FA workforce, Merrill Lynch has created a work and pay structure for CAs that results in a pattern of FLSA violations, including the failure to maintain proper employment compensation records and the failure to pay lawful overtime for hours CAs are required to work.

35.     Merrill Lynch requires that management approve overtime before it is paid. However, Merrill Lynch management frequently refuses to authorize overtime, even in situations where the CA is compelled to work overtime by her supervising FA. This denial of overtime pay is unlawful under the FLSA, regardless of whether Merrill Lynch pre-approved the overtime hours worked.

36.     Many FAs require their CAs to work overtime, even without management authorization. As Merrill Lynch is well aware, many CAs, out of fear of angering their FAs or disturbing their compensation arrangements with the FAs, do not refuse to work the overtime hours requested or required by their FAs, nor do they raise overtime issues with or ask to be paid

9

overtime by their FAs. In any event, Merrill Lynch (and not the FA) is required to compensate CAs for their overtime.  Thus, many CAs are denied payment for the overtime hours owed to them because they worked the hours without prior management authorization, or are denied authorization after the fact, when Merrill Lynch management is well aware that the CAs have worked the overtime.  This denial of overtime pay is unlawful under the FLSA.

37.     Defendants thus knowingly and willfully violate the FLSA by failing to properly compensate its CAs, including for overtime worked, and by failing to properly record and account for the full time that CAs work, thereby creating incomplete and inaccurate work and payroll records.  Failure to maintain accurate record of overtime worked is also a violation of the FLSA.

38.     Merrill Lynch's policies, practices and conduct, in particular the CA compensation structure, leads to other violations of federal laws, including discrimination and retaliation on the basis of gender.  Female CAs suffer discrimination not only through disparate and unfair treatment, but also as a result of the discriminatory impact of Merrill Lynch's firm-wide policies and practices.

39.     As an example of such discrimination, females are often steered away from the FA role, which has a greater earning potential, to the less prestigious CA role.  Conversely, the few males who work as CAs are often "developed" out of the CA role, into the more prestigious Investment Associate ("IA") or even FA or other high producing roles.  Male CAs are also often placed on high producing teams that allow for their greater exposure, career development, and higher earnings.  Therefore, due to discriminatory job selection and steering practices, the majority of the Merrill Lynch CA workforce is and has been female.  Conversely, the great majority of the FA population at Merrill Lynch is male.

40.     Although high producing FAs have some role in selecting their CAs, Merrill Lynch management has the authority to assign CAs to certain FAs.[6]  Moreover, in deciding to shift the CAs' compensation and earning ability to the FA workforce, Merrill Lynch creates an unfair imbalance of power, a culture ripe for hostility and gender bias, and a breeding ground for discrimination and retaliation.  As a result, CAs assume many administrative, menial, traditionally "female," and personal, rather than professional, tasks, which are often denigrating, demeaning, and based on harmful gender stereotypes.

41.     Notably, although Merrill Lynch permits FAs to pay CAs, it sets no mandate, scale, or even advisory guidelines on how much the supplemental compensation should be, except that if the FA does engage in the supplemental compensation, it must pay the CA at least $100 annually if the FA decides to base the supplemental compensation on production hurdles, or percentages of the FAs production at various levels.  Otherwise, the amount of supplemental compensation is completely at the FA's discretion.  Importantly, FAs also have the discretion to change the amount of supplemental compensation, without explanation to the CAs or to Merrill Lynch management.  On information and belief, although Merrill Lynch requires that the supplemental compensation remain constant for a six-month period (*i.e.*, between January and June, and again between July and December), the FA has discretion to raise, lower, or completely eliminate the amount of the CA's supplemental compensation at will.

42.     FAs control a major portion of CAs' earnings, and thus, CAs "fortunate" enough to work for large producers or high producing teams endeavor to please their FAs, in part

---

[6] It is generally the high producing male FAs and teams that are assigned the "best" CAs and sales assistance, as Merrill Lynch strives to keep its top male producers appeased and place them in the best position for success and income generation, consistent with the pattern and practice of discrimination at Merrill Lynch as proven in *Cremin v. Merrill Lynch*, Case No. 96-C-3773 (N.D. Ill.).  The *Cremin* plaintiffs, who were female Merrill Lynch FAs, proved a pattern and practice of systemic discrimination against female FAs at the Firm.

because CAs have no real job security.  When CAs, and particularly female CAs, complain, or the relationship otherwise fails, Merrill Lynch protects the primarily male FAs, and often removes the CAs from the FA or the team.  This removal often happens without discussion with the CAs, and without regard for their track records, performance, or tenure.  The CAs essentially become free agents, or are placed on the next team or with the next FA, and must begin anew in their assignments.  Thus, a CA who has been with Merrill Lynch for 25 years is treated the same as a CA who has been with Merrill Lynch for 25 days.

43.     Merrill Lynch policies and practices with respect to CAs often harm the reputations and earning potential of CAs removed from FAs or teams, as Merrill Lynch management rarely gives any explanation or other indication to the branch that the separation is not the CA's fault or choosing.  Merrill Lynch often further retaliates against CAs, and specifically female CAs, who complain by removing them from their assignments and/or by failing or refusing to place them in situations where they can expect to make the same level of supplemental income.

**Individual Allegations**

**Nancy Martignago**

44.     Martignago has been employed as a CA for Merrill Lynch since approximately 1985.  Martignago has been a Registered CA throughout her tenure, as she has held securities licenses that remained active from her short tenure as an FA.

45.     During her over 25 years of employment with Merrill Lynch, Martignago has competently discharged all duties assigned to her and enjoyed an excellent reputation with regard to the high quality of her work and conscientious devotion to her job.  Nevertheless, Martignago was subjected to and harmed by Defendants' unlawful pay practices.

46.     In May 2007, Merrill Lynch assigned Martignago to work with the Holley/Schultz FA team in the Fort Worth, Texas branch office.  Martignago understands that the Holley/Schultz team was and is one of the highest producing teams in the branch, and in the State of Texas.

47.     Throughout Martignago's tenure at Merrill Lynch, she has regularly worked in excess of forty hours per workweek.  Martignago was regularly required to work through her lunch hour and after her normally scheduled work hours.  Indeed, Russell Holley ("Holley"), one of the FA partners of the Holley/Schultz team, frequently required Martignago to work overtime, including through her lunch hour, and at client events that would last many hours into the evening.  Merrill Lynch management was well aware that Martignago worked more than forty hours per workweek for Holley.

48.     Although Martignago frequently worked in excess of forty hours per workweek, Merrill Lynch refused to approve her overtime requests.  Indeed, Martignago's direct supervisor, Diane Giza ("Giza"), Client Relationship Manager, often instructed Martignago and other CAs not to work overtime and refused to approve their overtime requests or authorize payment for their overtime worked, despite Giza's knowledge that the CAs were working more than forty hours.  On one occasion, Giza said "Well, don't tell me that," or words to that effect, when she learned that Martignago and other CAs had worked overtime.[7]  Neither Giza nor any other member of Merrill Lynch management would authorize the overtime they knew the CAs worked,

---

[7] Martignago has also been improperly denied raises on account of her gender.  Merrill Lynch denied Martignago a cost of living increase in a recent salary review, claiming that she could not have any more raises because she was at the "top of her pay scale."  Martignago understands that male employees regularly receive cost of living raises, even when they have reached the top of their pay scale, and this is especially inappropriate because such raises are not merit based, but instead are based on the cost of living in a given market.

13

or approve overtime payments, nor did they instruct the FAs that CAs were not to work overtime or take any other appropriate action to ensure compliance with governing wage laws.

49.     Despite Martignago's excessive hours on the job, Defendants did not pay her the overtime wages for the overtime she worked.  In denying Martignago's overtime requests, Defendants also failed to keep accurate payroll records or other records of Martignago's working hours.

50.     Merrill Lynch also underpaid Merrill Lynch for the overtime it approved and recorded.  Merrill Lynch calculated Martignago's overtime pay based on her salary only, and did not pay her time and a half, or any overtime compensation, based on her supplemental compensation.

51.     Additionally, despite Martignago's performance and dedication to the team, Holley frequently marginalized, belittled and berated Martignago, often utilizing gender stereotypes.  In addition to requiring Martignago to perform his personal errands, Holley openly criticized and embarrassed her, verbally attacking her both personally and professionally, where similarly situated males were not subjected to such harsh treatment.

52.     Holley criticized and punished Martignago when she sought to help a female FA who joined the Holley/Schultz team in or around January 2009.  After the FA's health required her to take a medical leave, Martignago stepped in to help manage the female FA's accounts in her absence.  As a result, Holley decreased Martignago's supplemental compensation, stating that she needed to focus "on the team" which Martignago could only interpret as to mean Holley.

53.     In or around May 2008, Holley hired a new female CA onto the team when another CA retired. The new female CA was young and attractive, and Holley treated her differently, consistent with the pattern of male FAs viewing their female staff as sex objects.  For

14

example, when Holley decided to move the team to the Southlake, Texas branch in January

2009, he informed the team that he could initially take only one CA with him. Although

Martignago was senior to and had longer tenure than the new female CA, and even though

Holley was aware that the move to Southlake would assist Martignago personally because

Southlake was closer to her ailing mother, who was suffering from advanced Alzheimer's

disease, Holley took the less experienced and tenured but younger and more attractive female

CA with him to Southlake. Martignago was left behind in Fort Worth until Holley transferred

the rest of the team to Southlake.

54.     When Martignago arrived at Southlake, Holley's differential treatment of the new

female CA continued. Holley refused to give Martignago a suitable workspace for a CA of her

experience and tenure. Indeed, Martignago was forced to share a small, unused conference room

with the branch's interns, with only a partition between them to divide her workspace from

theirs. Conversely, Holley gave the new female CA a large cubicle near his own office, allowing

her to be the first point of contact with all of his clients.

55.     Holley also regularly engaged in open and inappropriate behavior of a flirtatious

and sexual nature toward the new female CA, which created an intolerable and hostile work

environment for Martignago.

56.     After months of enduring Holley's differential treatment and having to personally

witness the inappropriate interactions between Holley and the new female CA, Martignago

complained and expressed frustration via email to a friend and fellow CA.

57.     Merrill Lynch management seized possession of the email, and was therefore on

notice of Martignago's complaints and hostile working environment. Merrill Lynch did not

properly investigate Martignago's complaints, including failing to interview Martignago

regarding her complaints, experiences or work environment. Instead, Merrill Lynch retaliated against Martignago by removing her from the Holley/Schulz team and from the Southlake branch, without explanation or discussion.

58.    Martignago was then demoted and transferred back to the Fort Worth branch to assist a lower producing team than the Holley/Schultz team, which adversely impacted Martignago's compensation and earning power. Martignago's retaliatory demotion and transfer back to Fort Worth has resulted in both career damage and financial harm, as Martignago's reputation has been sullied by both her removal and demotion from the Holley/Schultz team, and her public and humiliating demotion and transfer from Southlake back into Fort Worth.

**Rhonda Deeney**

59.    Rhonda Deeney has been employed by Merrill Lynch for over 28 years. Deeney became a CA in 1981, a registered CA in 1984, and has worked as a CA in the Chesterfield, Ladue, Clayton, and St. Peters, Missouri Merrill Lynch branch offices. In August 2008, Deeney was demoted from a CA to a receptionist. Deeney had no choice but to leave Merrill Lynch in October, 2008.

60.    During her employment with Merrill Lynch, Deeney has competently discharged all duties assigned to her and enjoyed an excellent reputation with regard to the high quality of her work and conscientious devotion to her job.

61.    Deeney was subjected to and harmed by the unlawful pay policies and practices described herein, in violation of the FLSA. Deeney worked overtime as a CA, but her overtime hours were often not recorded and she was not paid for this overtime. When Deeney was credited for her overtime work, Merrill Lynch only paid her based on her base salary and not her supplemental compensation.

### Amy Ferguson

62.    Amy Ferguson worked for Merrill Lynch for approximately 11 years.  Ferguson was employed as a CA in the Naples, Florida Merrill Lynch branch offices from December 1999 to April 2011.  Ferguson was subjected to and harmed by the unlawful pay practices described herein, in violation of the FLSA.

63.    After Bank of America acquired Merrill Lynch and took over operations, CAs continued to work overtime without proper compensation.

During her employment with Merrill Lynch, Ferguson competently discharged all duties assigned to her and enjoyed an excellent reputation with regard to the high quality of her work and her conscientious devotion to her job.  Indeed in 2010, Ferguson was awarded the 100% Client Satisfaction Award and was ranked in the top five CAs out of her complex's approximately fifty CAs.

64.    When Ferguson worked overtime that was recorded, Merrill Lynch only paid her based on her base salary and not her supplemental compensation, which comprised a substantial portion of her regular earnings.

65.    Ferguson often worked overtime but was not compensated for the work she performed.  Ferguson's branch manager told CAs that they were not eligible for overtime, although management and the FAs required such work.

66.    To illustrate, Ferguson and other CAs in her office were required to work though their lunch hours and work past normal business hours but were not permitted to submit for overtime.  This happened regularly during tax time or at the end of the year.  CAs were also often required to work after hours and cold call clients regarding products or company initiatives. The CAs generally worked four-hour shifts but were paid with "pizzas" rather than overtime pay.

17

On two such occasions, all of the CAs in the complex worked after hours on this project. The CAs worked for four hours, but were given credit and paid for only one hour of overtime. Similarly, CAs were often required to work through their lunch hour without pay when the branch was short-handed.

67.     On another occasion, Ferguson and Sellers worked to transition a new male FA to the Firm at the Firm's direction. Merrill Lynch only approved Ferguson's overtime for a two-month period despite the fact that it required four months to transfer the FA's over one thousand accounts. Ferguson was not compensated for the time she worked after close of business and on weekends to complete the transition of the FA's accounts, which substantially benefited the Firm.

68.     In or around 2010, Complainant was assigned to three individual FAs and a team of two FAs because the office was understaffed. Immediately the senior, male member of the team of FAs began bullying and humiliating Complainant on a daily basis despite her excellent work product and unassailable devotion to the team, creating a hostile work environment on account of her sex.

69.     Ferguson complained to management about her treatment but no investigation or corrective action was taken. Instead, Ferguson was told that it must have just been a "miscommunication," or words to that effect. Ferguson's legitimate civil rights complaints were futile and ignored. Merrill Lynch refused to support Ferguson, or other female CAs, and she was forced to endure the treatment of the male FA to which she had been assigned by the Firm.

70.     During her tenure, Ferguson observed that the Firm supported and promoted male CAs but not female CAs. For example, the Firm hired a male CA and subsequently promoted him to the position of IA, despite his having less tenure and experience than many more qualified

18

female CAs.

71.     On April 15, 2011, Ferguson's work environment was unbearable, and she was constructively discharged after over eleven years of service. Ferguson could no longer endure the degrading and humiliating conduct while performing work for which she was not compensated commensurate with the overtime she worked.

**Cindy Sellers**

72.     Sellers is currently a CA in the Seattle, Washington branch office of Merrill Lynch and has also served as a Merrill Lynch CA in Naples, Florida, and Bridgewater, New Jersey.  In her role as a CA in each of these branch offices, Sellers was harmed by the unlawful pay practices described herein, in violation of the FLSA.

73.     After Bank of America acquired Merrill Lynch and took over operations, CAs continued to work overtime without proper compensation.

74.     During her employment with Merrill Lynch, Sellers has competently discharged all duties assigned to her and enjoyed an excellent reputation with regard to the high quality of her work and conscientious devotion to her job.  Sellers earned her bachelors' degree in Finance and Management and so was well qualified to succeed as a CA.  Indeed, as a result of her excellent performance, Sellers earned the Essential Partner Award in 2008 – an award given to the top 150 CAs in the nation, and was named CA of the Year in 2007, and awarded the Top Performer Award in 2009.

75.     Sellers often worked overtime but was not credited or compensated for the work she performed.  To illustrate, Sellers and other CAs in her office were required to work though their lunch hours and work past normal business hours but were not permitted to submit for overtime.  This happened regularly during tax time or at the end of the year.  CAs were also

often required to work after hours and cold call clients regarding products or company initiatives. Similarly, CAs were often required to work through their lunch hour without pay when the branch was short-handed.

76.     When Sellers worked overtime that was recorded, Merrill Lynch only paid her based on her base salary and not her supplemental compensation, which comprised a substantial portion of her regular earnings.

77.     Merrill Lynch told Sellers and other CAs in both the Naples and Seattle branch offices that they were to enter their time worked on the system but that CAs were not allowed to enter overtime unless it was pre-approved.  Sellers asked management in both offices, including earlier this year, whether this meant that CAs should report the actual amount of time they worked, or "adjust" their time to exclude their overtime hours.  Management's standard response was to state that CAs are not allowed to work overtime and should not enter overtime.

78.     Approximately twice a month while Sellers worked in Naples, she was required to attend client events and seminars for the team of FAs she assisted, which typically were four hours long.  Management would not pay overtime for Sellers' attendance at these events and told her it was the FAs' responsibility to compensate her for the overtime she worked.  Sellers' FAs refused to do so.  Sellers was similarly not paid overtime for many occasions when she was required to visit clients' residences during her lunch or after hours.

79.     On another occasion, Sellers and Ferguson worked to transition a new male FA to the Firm at the Firm's direction.  Overtime was only approved for Sellers for a short period despite the fact that it took substantially longer to transfer the FA's many accounts.  During that additional time, Sellers was not compensated for the time she worked after close of business and on weekends to complete the transition, which substantially benefited the Firm.

80.     In Naples, Sellers was assigned to a team of FAs who bullied and humiliated her, creating a hostile work environment.  These FAs held one of Sellers accounts and, following spending in her account, and refused her a raise because they did not "believe she spent her money the right way," or words to that effect.  Sellers complained to management regarding her treatment but was told to "just appease" the FAs.  Sellers continued to diligently assist the FA team, helping to double the team's production doubled from $600,000 to $1.2 million in the six years Sellers assisted them.

81.     Sellers' successes generated interest among other FAs who wished to work with her and even offered to pay her higher supplemental compensation.  However, management refused to allow Sellers to work with other FAs and instead insisted that she continue to service her team of FAs.  Sellers was thus denied the opportunity to move up at the Firm and/or earn additional compensation.

82.     Sellers also pursued advancement opportunities at the Firm but was denied these opportunities on account of her sex and in retaliation for complaining about her treatment. Sellers asked management about potentially becoming an IA or an FA.  Management discouraged Sellers told her that "the Firm didn't need an IA right now" and that "it was very difficult for a woman to do the job of an FA with a family," or words to that effect.  Although Sellers had expressed interest in the IA position, the Firm hired a male CA who was subsequently promoted to the position of IA despite having less tenure and experience than Sellers. This was consistent with Sellers' observations that men were steered towards more lucrative career paths by the Firm during her tenure.

83.     Sellers also sought to become a Client Relationship Manager ("CRM").   Sellers attended management assessment but was deferred, ostensibly in order to develop further

leadership skills.  Upon learning that Sellers had sought out this opportunities, her treatment by the FAs to whom she was assigned grew even more hostile.  Due to Sellers' ongoing complaints and the open hostility towards her in the office, management was aware of the abusive treatment Sellers endured but took no corrective action.

84.     In late 2010, Sellers interviewed with a Seattle, Washington Merrill Lynch top 1000 team for a position as their CA.  Sellers spoke with Seattle's CRM regarding both her base compensation and the supplemental compensation.  Sellers base salary was non-negotiable and set by the Firm, and the FAs to whom she would be assigned set her supplemental compensation.  Sellers was required to be in Seattle to begin her new position two weeks later before an impending hiring freeze.  Sellers believed that this was an incredible opportunity that would change her family's life.  Sellers borrowed money from her 401k and left her family in Naples (for a period of time) in order to immediately move to Seattle.

85.     In December 2010, Sellers arrived in Seattle and experienced a dramatic change from her interview process.  The FAs did not speak to her during the day, and the office did not help ensure a smooth transition.  Regardless, Sellers reviewed the FAs' book of business and showed them how they could get more credit for their client accounts and better serve their clients.  Three weeks later, Merrill Lynch informed Sellers that she was being demoted to another group of FAs and "at least she had a job," or words to that effect.

86.     Subsequently, Sellers was assigned to a lower producing team, which adversely impacted Sellers' compensation and earning power.  Sellers' demotion has resulted in both career damage and financial harm, as Sellers' reputation has been tarnished by both her removal and demotion.

87.     Sellers understands that just as in the prior Merrill Lynch branches where she worked, that CA overtime must be pre-approved in the Seattle branch and is paid based only on a CA's base salary.


## COUNT I

## VIOLATION OF THE FAIR LABOR STANDARDS ACT BASED ON POLICY OF FAILURE TO PAY OVERTIME ON SUPPLEMENTAL COMPENSATION

### (Collective Action and Individual Claim)

88.     Plaintiffs incorporate by reference each and every allegation set forth in this Complaint as if stated herein.

89.     Plaintiffs bring FLSA claims on behalf of themselves and all those similarly situated who are or were employed by Defendants as CAs within three years from the commencement of this action, and who have been or are being denied compensation, or who are not or have not been properly compensated for hours worked in excess of forty hours per workweek.

90.     Plaintiffs seek to proceed against Defendants for their FLSA violations as a collective action, as alleged in this complaint, and pursuant to the collective action provisions of the FLSA.

91.     Plaintiffs understand that there are thousands of similarly situated current and former CAs who are or were employees of Defendants, and who are or have been underpaid in violation of the FLSA, and who should be notified of and allowed to opt-in to this action, pursuant to 29 U.S.C. § 216(b).

92.     Many of these similarly situated CAs would not otherwise be able to pursue their federal wage claims without the assistance of this collective action, because they lack the

financial resources to prosecute the action on an individual basis, and/or because they fear retaliation, among other reasons.

93.    The names and addresses of these similarly situated employees are available from Defendants.  Defendants can readily locate them so that notice of this action can be issued.

94.    Throughout the relevant time period, Plaintiffs have been employees of Defendants as defined by the FLSA.

95.    Throughout the relevant time period, Defendants were and are employers of Plaintiffs and the FLSA class, as defined by the FLSA, and are engaged in commerce and/or the production of goods for commerce as defined by the FLSA.

96.    Merrill Lynch CAs, including Plaintiffs, are nonexempt employees as defined by the FLSA.

97.    Merrill Lynch CAs, including Plaintiffs, are not subject to any of the exemptions as defined by the FLSA.

98.    At all times relevant, Defendants have willfully failed to pay Plaintiffs and the FLSA class overtime compensation at the legally mandated rate of one and one-half times their regular rate of pay, for hours worked in excess of forty hours per workweek.  By failing to do so, Defendants have violated the overtime wage provisions of the FLSA.

99.    Pursuant to corporate policies, Defendants have willfully and intentionally violated the FLSA by failing to properly pay Plaintiffs and the FLSA Class overtime wages as defined by the FLSA by paying CAs overtime rates based upon their base salaries only, and not their total compensation, including their company-sanctioned supplemental compensation.

100.    Plaintiffs expressed their consent to make these claims under the FLSA against Defendants pursuant to 29 U.S.C.A. § 216(b), as is demonstrated by their written consents

attached hereto as Exhibit A.  Plaintiffs expect that other individuals will sign consent forms and join as plaintiffs on this claim in the future.

101.    The foregoing conduct, as alleged, constitutes a willful violation of the FLSA within the meaning of 29 U.S.C.A. § 255(a).  Thus, Plaintiffs and the FLSA class are entitled to the longer, 3-year limitations period in this action.

102.    As a result of Defendants' unlawful actions, Plaintiffs and the FLSA class have suffered harm and are entitled to damages.  Plaintiffs, on behalf of themselves and the nationwide FLSA class, seek damages including unpaid overtime compensation, liquidated damages, attorneys' fees and costs, interest, and any and all such other equitable and legal relief permitted by the FLSA, and which this Court finds just and proper.

## COUNT II

### VIOLATION OF THE FAIR LABOR STANDARDS ACT BASED ON REFUSAL TO PAY OVERTIME OR MAINTAIN RECORDS

### (Collective Action and Individual Claim)

103.    Plaintiffs incorporate each and every allegation set forth in this Complaint.

104.    At all times relevant, Defendants have willfully and intentionally failed to pay Plaintiffs and the FLSA class overtime compensation for hours worked in excess of forty hours per workweek.  By failing to do so, Defendants have violated the overtime wage provisions of the FLSA.

105.    This conduct consists of a persistent pattern and practice of violating the FLSA by failing to properly pay Plaintiffs and the FLSA Class overtime wages as defined by the FLSA, and failing to credit them for overtime hours worked in excess of forty hours per workweek.

106.    Defendants have also willfully failed to record, report, and maintain accurate work records for hours worked and wages earned by Plaintiffs and the FLSA Class as required

by the FLSA, 29 U.S.C.A. § 211. Additionally, any records that Defendants did in fact keep concerning the number of hours Plaintiffs and the FLSA Class worked in excess of forty hours in any workweek are in the possession and control of Defendants and, as such, Plaintiffs are unable to state the exact amount due and owing to them at this time.

107.    Plaintiffs expressed their consent to make these claims under the FLSA against Defendants pursuant to 29 U.S.C.A. § 216(b), as is demonstrated by their written consents attached hereto as Exhibit A.  Plaintiffs expect that other individuals will sign consent forms and join as plaintiffs on this claim in the future.

108.    The foregoing conduct, as alleged, constitutes a willful violation of the FLSA within the meaning of 29 U.S.C.A. § 255(a).  Thus, Plaintiffs and the FLSA class are entitled to the longer, 3-year limitations period in this action.

109.    As a result of Defendants' unlawful actions, Plaintiffs and the FLSA class have suffered harm and are entitled to damages.  Plaintiffs, on behalf of themselves and the nationwide FLSA class, seek damages including unpaid overtime compensation, liquidated damages, attorneys' fees and costs, interest, and any and all such other equitable and legal relief permitted by the FLSA, and which this Court finds just and proper.

## COUNT III

### BREACH OF CONTRACT AND/OR UNJUST ENRICHMENT
### (For All Plaintiffs)

110.    Plaintiffs incorporate each and every allegation set forth in this Complaint.

111.    Defendants entered into certain oral and written contracts with Plaintiffs, whose terms are set forth in written instruments, oral promises, practices of customary conduct, employee handbooks, and Firm policies, among other things.  These contracts governed and

created obligations to Plaintiffs with respect to their terms of employment, including that Defendants would act in compliance with federal law.

112.     These contracts required Defendants' compliance with their terms and with federal laws, including but not limited to the FLSA.

113.     Defendants breached these contracts by engaging in the conduct described herein and by otherwise failing to perform its obligations under these agreements and the laws set forth in this Complaint.

114.     Moreover, by breaching these contracts, Defendants have been unjustly enriched by the work that Plaintiffs performed for the Defendants' benefit, but for which she was not compensated.

115.     Defendants' breaches of these agreements caused Martignago substantial harm, for which they are owed, and seeks damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court find in favor of them and the FLSA and ERISA Classes and against Defendants as follows:

a.    Designation of this action as a collective action on behalf of the proposed members under the FLSA, and that the Court issue prompt notice to all similarly situated putative collective action plaintiffs to provide them notice of this action, the nature of the claims, and of their right to file consents and join this lawsuit pursuant to 29 U.S.C. § 216(b);

b.    Designate Plaintiffs as Class Representatives for the putative collective action plaintiffs;

c.    Designate Plaintiffs' counsel of record as counsel to represent the putative collective action plaintiffs;

d.    A declaratory judgment that Defendants' acts, conduct, policies and practices complained of herein are unlawful and violate the FLSA;

e.    Order appropriate equitable and injunctive relief to remedy the violations of the FLSA;

f.    Award Plaintiffs and all others similarly situated the value of all compensation and benefits lost as a result of Defendants' unlawful conduct, including, but not limited to unpaid overtime wages and liquidated damages;

g.    Award Plaintiffs and all others similarly situated prejudgment and post-judgment interest and attorneys fees, costs and disbursements, as provided by law;

h.    Award Plaintiffs the value of all compensation and benefits lost as

a result of Defendants' breach of contract, including but not limited to restitution of any funds that Defendants have unjustly received from Plaintiffs; and

       i.    Award Plaintiffs and all others similarly situated such other relief as this Court deems just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiffs hereby demand a jury trial as provided the Federal Rules of Civil Procedure

with respect to any and all claims to which she and all those similarly situated have a right to a

jury trial.

Dated: 8/24/11

Respectfully submitted on behalf of Plaintiffs
Nancy Martignago, Rhonda Deeney, Amy
Ferguson, Cindy Sellers and all those similarly
situated,

By: _____

Jennifer Schoen Gilbert
(Admitted in Illinois and Indiana)
Application for Admission on Motion to
Practice as an Attorney and Counselor-at-Law
in the State of New York pending.

Linda D. Friedman
Jennifer S. Gilbert
**STOWELL & FRIEDMAN, LTD.**
321 S. Plymouth Court, Suite 1400
Chicago, IL 60604
312-431-0888 (phone)
312-431-0228 (fax)
Jgilbert@sfltd.com

By: _____

Shona B. Glink (Local Counsel)

Shona B. Glink
**MEITES, MULDER & GLINK**
321 South Plymouth Court, Suite 1250
Chicago, Illinois 60604
312-263-0272 (phone)
312-263-2942 (fax)
SBGlink@mmmglaw.com
**(Local Counsel)**